Sean Snyder
(Pro Se)
4305 N.E. 143rd Ave
Vancouver, Wa 98682 U.S.A.
1(360)719-0093
Email: frenzygear@comcast.net



FILED
LODGED
RECEIVED
NOV 25 2019
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

TACV015951 / no Summons issued

Sean Snyder, an individual

        Plaintiff,

v.

Stox Technologies LTD, a corporation, Moshe Hogeg, an individual, and DOES 1-10

        Defendant(s).

CASE NO. CV19-6132-RJB

COMPLAINT FOR:
1) BREACH OF CONTRACT;
2) BREACH OF FIDUCIARY DUTY;
3) FRAUD;
4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
5) UNJUST ENRICHMENT
6) DECLATORY RELIEF
7) ACCOUNTING
AND
8) RICO (18 U.S.C. §§ 1961, ET SEQ.);
(28 U.S.C. § 1332; Diversity of Citizenship)
(28 U.S.C. § 1331)

1

Plaintiff Sean Snyder ("Snyder" or "Plaintiff"), alleges as follows. Any allegations in this complaint that are contrary to or inconsistent with one another are made in the alternative.

## JURISDICTION AND VENUE

Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case, and also Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case, also under RICO (18 U.S.C. §§ 1961, ET SEQ.)

## SUMMARY

1. Plaintiff purchased a significant number of Stox Tokens (the cryptographic token used on the Stox Platform ("Platform"), in reliance upon statements made in the relevant Stox White Paper, in particular as to how, when, and in what quantities Stox would be releasing Tokens into the market place. Those statements transpired to be false and/or were not in the event adhered to by Defendants with the result that the market was improperly flooded with Tokens, causing a drastic and unpredictable loss in value of the currency.

2. Once Plaintiff realised what had transpired, he took prompt steps to limit his exposure but nonetheless incurred significant losses, for which he contends the Defendant's herein are liable.

3. Seeking to enrich themselves at the expense of Plaintiff and others, Defendant Moshe Hogeg ("Hogeg"), his co-conspirators, and agents have defrauded U.S. investors and others from all over the world out of hundreds of millions of dollars, of which Plaintiff claims damages of not less than $430,000

4. Motivated by greed and with total disregard for anyone but themselves, Hogeg and his co-conspirators have committed numerous illegal acts. They have breached their contractual obligations and fiduciary duties to Plaintiff; and they have illegally promoted and sold worthless, unregistered securities.

5. Defendants issued and sold securities to U.S. investors without providing those investors important information about their business operations, financial condition, risk factors and management without filing a registration statement for the cryptocurrency tokens that they issued and sold as they are required to do under the Securities Act of 1933.

6. Defendants launched a series of fraudulent and illegal securities offerings that not only violate Plaintiff's rights but also violate numerous civil and criminal laws.

7. Hogeg has used the profits from these sales to fund numerous expensive purchases, including $19 million to acquire land in Tel Aviv in one of the most expensive residential real estate transactions in Israel's history, $7.2 million for his acquisition of Beitar Jerusalem, one of Israel's top soccer clubs, and a $1.9 million donation to Tel Aviv University, who together have joined to launch the Hogeg Blockchain Research Institute.

## PARTIES

8. Plaintiff Sean Snyder is an individual who, throughout all times relevant to this action, was domiciled in Washington State and lived in this judicial district. Plaintiff is also a United States citizen.

9. Defendant Stox Technologies LTD is a Corporation registered in Gibraltar.

10.. Defendant Moshe Hogeg is an individual currently residing in Israel. On information and belief, Hogeg is a citizen of Israel. Hogeg is listed as the sole shareholder of Stox Technologies LTD. Hogeg has a now well-established reputation as a "hype" master who became rich by defrauding those who have invested in the worthless tokens (securities) he has issued and sold on world-wide Cryptocurrency Exchanges (i.e. "Liqui Exchange") that permit, or at the time permitted, U.S. Citizens to buy and sell multiple cryptocurrencies, including STX tokens.

12. Plaintiff is currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictitious names Does 1 through 10, and therefore sues such Defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of said fictitiously named Defendants when their true names and capacities have been ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Doe Defendants is legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiff.

13. Plaintiff is informed and believes, and on that basis alleges, that all Defendants including the fictitious Doe Defendants, were at all relevant times acting as actual agents, captive agents or brokers, conspirators, ostensible agents, partners, brokers and/or joint venturers, and employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization, and ratification of their co-defendants; however, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

## STATUTORY FRAMEWORK

14. Congress enacted the Securities Act of 1933 ("Securities Act") to regulate the offer and sale of securities. In contrast to ordinary commerce, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest. Registration statements relating to an offering thus provide public investors with financial and managerial information about the issuer and the risks and trends that would affect the enterprise.

15. Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption. These prohibitions apply to a "distribution" of securities, the entire process by which, in a public offering, a block of securities is dispersed and ultimately comes to rest in the hands of the investing public.

16. The registration statements contemplated by the Securities Act require disclosures that provide the public with the information necessary to make an informed investment decision. Disclosures in a registration statement typically require items of information concerning financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an

analysis of the risks and material trends that would affect the enterprise. They also impose on issuers a duty periodically to update this information.

17. For example, Item 3 on a Form S-1 registration statement calls for management's assessment of significant factors that make the offering speculative or risky. In addition, Rule 421(d) of Regulation S-K requires plain English disclosure (important for unsophisticated investors in a nascent or unproven tech innovation) [17 C.F.R. § 230.421(d)]. Finally, Sections 11 and 12 of the Securities Act [15 U.S.C. §§ 77k, 77l] impose strict liability on the issuer and underwriters of securities for false statements in registration statements.

18. Section 5 of the Securities Act, by its terms, is all embracing; it prohibits any unregistered securities offering. Through exemption provisions like Section 4 of the Securities Act [15 U.S.C. § 77(d)], however, Congress distinguished between (1) those transactions that occur during the process by which securities are distributed to the public in an offering that emanates from the issuer of the securities, and (2) subsequent trading transactions in the market by investors once the securities have come to rest with investors.

19. In drawing this distinction between distributions and trading, Congress sought to provide the protections afforded by registration both where securities are sold to the public by the issuer, and where they are publicly sold through an intermediary who buys the stock from the issuer with a view to public resale, defined as "underwriters." 15 U.S.C. § 77b(a)(11). Congress enacted a broad definition of underwriter to include all persons who might operate as conduits for securities being placed into the hands of the investing public.

20. A distribution by issuers and/or underwriters is not exempt under Section 4 and requires registration unless some other exemption or safe harbor applies. The exemptions and safe harbors are structured to exempt transactions where the purpose and protections of registration have been otherwise satisfied. The party claiming that a distribution is entitled to an exemption bears the burden of claiming the exemption.

21. The definition of a "security" includes a wide range of investment vehicles, including "investment contracts." Investment contracts are instruments through which an individual invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. In a variety of circumstances, courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet. As the U.S. Supreme Court has noted, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

## BACKGROUND ON DIGITAL TOKENS

22. The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens." Entities have offered and sold digital tokens in fundraising events, often called "ICOs," in exchange for consideration.

23. Generally, digital tokens may entitle holders to certain rights related to a venture underlying the fundraising event, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These digital tokens may also be traded on digital-asset trading platforms where they are tradeable for other digital assets or fiat currency. The coins or tokens are often tradeable upon delivery to investors.

24. Issuers of digital tokens typically release a "whitepaper" or marketing materials describing the project and the terms of the issuance. To participate, investors typically transfer funds to the issuer's accounts. After the completion of the issuance, the issuer will deliver its unique token to the participant's unique address on a distributed ledger or blockchain.

25. In some instances, the digital tokens may continue to be sold by the issuer. In others, they may only be obtained after issuance by purchasing them in secondary markets.

26. Defendants' Stox and all other ICOS offering followed the publication of the SEC's Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (Exch. Act Rel. No. 81207) (July 25, 2017) (the "DAO Report"), which put the digital asset industry on notice that many digital assets such as the ICOS tokens are securities under SEC v. W.J. Howey Co., 328 U.S. 293 (1946), and subject to the federal securities laws, including registration requirements.

27. By not registering the ICOS offering, the company deprived the Plaintiff and other investors of meaningful information that would be found in a registration statement that investors could use to assess the company's prospects.

28. Defendants' conduct is ongoing, in November 2019 Moshe Hogeg launched another ICO for BLOCKTV hoping to raise an additional $6 Million.

29. Defendants continue to expose investors to risky securities without complying with provisions of the federal securities laws designed to ensure investors have adequate information to evaluate such investments.

30. By this conduct, Defendants have violated Sections 5(a) and 5(c) of the Securities Act for the unregistered offering of ICOS tokens.


## FACTS

### A.  Merger With Anyoption to Acquire Its Binary Options Infrastructure.

31. In 2017, about a year after launching Invest.com, Hogeg and the other defendants orchestrated a "merger" amongst Invest.com and Anyoption.com in order to convince millions of people around the world to hand over their money for worthless cryptocurrencies behind a veneer of legitimacy supplied by the Invest.com name. This way, Hogeg and his co-defendants could create the impression that the things being sold were legitimate investments, rather than the false promises they really were.

32. Once this was in place, Hogeg and his co-defendants embarked on a path that would enrich them to the tune of several hundred million dollars, while violating laws and regulations all over the world.

33. Using the invest.com name to make their claims that they were selling legitimate investments more credible, Hogeg and the other defendants repurposed the former Anyoption boiler rooms, affiliate systems and call centers now housed within Invest.com to "sell" millions of dollars of worthless "cryptocurrency" to unsuspecting "investors" through Initial Coin Offerings ("ICOs").

34. The Defendants had been planning this scheme for months by that time. More than four months before Defendants conducted the first of these ICOs, Rakishev ( Hogeg's business partner) foreshadowed what would follow when he told attendees at Syneq Business Forum that he, Hogeg and others involved in Singulariteam intended to start selling cryptocurrencies in the near future.

**B. Shareholders of Anyoption allege fraud and theft.**

35. In November 2018 an article was published in Globes, https://en.globes.co.il/en/article-moshe-hogeg-in-legal-tangle-over-acquired-company-1001261019, wherein it stated that; (emphasis added) "Shareholders of Anyoption ("AOH"), acquired by Hogeg's Invest.com ("IDC"), allege fraud and theft. The AOH shareholders petitioned the Tel Aviv District Court on Thursday for a liquidation order against IDC, which engages in offerings of virtual currency to the public. The petition alleges that Hogeg covertly removed assets worth tens of millions of dollars from the company, to the point of making it insolvent. In the framework of the petition, the shareholders make extremely serious allegations and accusations against Hogeg. Among other things, they claim that Hogeg stole, robbed, and looted money to which they were entitled under various agreements signed with a company under his control. They allege that the information they discovered showed that IDC was deceitfully managed; Hogeg, the controlling shareholder and driving force in IDC, is using the company's assets for his personal needs and deriving personal benefit from them; and the controlling shareholder loots and steals the company's assets and rights amounting to tens of millions of dollars." The shareholders also claim that IDC and Hogeg have acted with a lack of transparency, concealing information and documents. In view of this behavior, they say, they have a "real and concrete" concern that Hogeg is covertly removing IDC's assets, money, and rights and taking them for himself or giving them to strawmen on his behalf. In the petition they filed through Adv. Ofer Furth, Adv. Lior Dagan, and Adv. Lior Liberman from the Furth-Wilensky-Mizrachi-Knaani law firm, the shareholders in AOH ask the court to appoint

Dagan and Adv. Adi Figel as provisional liquidators for IDC, and to issue an order barring IDC or anyone on its behalf from making any disposition of the company's rights or assets. According to the liquidation petition, in June 2017, they contracted a merger agreement with IDC, a private company incorporated in Cyprus that conducts initial currency offerings (ICOs) to the public and operates through IDC Israel, its subsidiary in Israel. Hogeg, the controlling shareholder in IDC, is the sole director of IDC Israel and a director of IDC. The petitioners assert that Hogeg controls and directs the company's activity through a foreign fund (Singulariteam), whose offices are located in Israel. The liquidation petition alleges that in the framework of the merger agreement (and a revised merger agreement signed by the parties in February 2018), the parties agreed that IDC would receive all of the shares, assets, and activity of AOH, which would be absorbed into the IDC group. This was in return for 35% of the shares, a $3.5 million payment from IDC's expected profits from expected future ICOs, and an additional payment of 465,000 tokens (virtual currency) of Stox Technologies (STX) worth millions of dollars more. The petition also alleges that Hogeg personally undertook to immediately inject $3 million of his own money into IDC for its activity, plus tokens worth $6 million more, without diluting the petitioners as shareholders in IDC. The petition further states that even before the merger agreement (both the original and revised agreements) was signed, an agreement was signed on June 15, 2017 between IDC and STX, then in the process of being founded and registered in Gibraltar, stating IDC was a founding partner of STX and was accordingly entitled, among other things, to 25% of the shares in STX. According to the liquidation petitioners, shortly after the original merger agreement in June 2017, they fulfilled their part of the bargain by transferring to IDC and Hogeg full control of AOH, including control of its activity, assets, rights, funds, employees, know-how, and goodwill. It is further alleged that IDC and Hogeg replaced the directors in AOH and IDC, and also drew a $500,000 loan from AOH. The petitioners say that before the merger agreement with IDC, AOH had three million customers in its customer portfolio, owned licenses for its activity (binary options) in Europe and many other countries, had a cash balance, was entitled to money under the agreement for future revenue, had extensive marketing and financial infrastructure, had a highly trained

professional sales team and trained and experienced employees, etc. It is alleged that since the IDC merger

agreement was signed, Hogeg carried out a number of ICOs through STX. As part of one of the ICOs, STX raised

$34 million from the public, and the value of the issued currencies ballooned to $60 million shortly afterwards.

According to the petitioners for liquidation, although the ICOs carried out relied on the know-how, goodwill, and

employees of AOH in the presentations to investors in the ICOs, based on the employees, offices,

accomplishments, and customers of AOH, Hogeg covertly transferred IDC's assets and rights to other

corporations under his control, or to corporations under the control of strawmen on his behalf. It was also

alleged that Hogeg "did, and is doing, whatever he wanted with IDC's money and property, while emptying the

company of its assets." The liquidation petition makes accusations against IDC's controlling shareholder - Hogeg.

It claims that the petitioners learned after the ICOs that Hogeg had founded STX and registered 100% of it issued

share capital in his name and under his ownership, even though the provisions of the merger agreement state

clearly and explicitly that IDC was entitled to 25% of the shares in STX, among other things. In other words, the

petitioners are claiming that Hogeg stole and robbed IDC's shares in STX, which according to the results of the

ICO should have generated $15 million for IDC. The petitioners add that all of the proceeds that IDC should

received under the STX agreement following the allegedly successful ICO, i.e. $3 million and 25% of the unsold

tokens, were not transferred, were not paid, and in effect were stolen from IDC by Hogeg through the use of

fraud. In the framework of the petition, the petitioners charge Hogeg with deceit and theft. They say that Hogeg

"coveted and stole" the STX shares belonging to IDC, after having registered the IDC shares in his name and

ownership, following the successful ICO by STX. According to the petitioners, Hogeg concocted a fictitious

purchase agreement through which he "bought" IDC's shares in STX for $3 million, while not bothering to pay IDC

the fictitious proceeds of $3 million. Simultaneously with these acts, in addition to the alleged theft of IDC shares,

the liquidation petition alleges that Hogeg added insult to injury by not transferring a $3 million payment and 25%

of the unsold tokens in the ICO (another $8.9 million) to which IDC was entitled from STX, in violation of the

merger agreement, the petitioners say. The petitioners further allege that Hogeg is covertly transferring IDC's

assets, activity, and rights to straw companies under his control or that of his relatives and associates. For

example, it is alleged that Hogeg registered his private driver (who is also the husband of his personal assistant)

as the owner of a company he founded), "through which Hogeg competes with IDC's business, takes personal

advantage of IDC's business opportunities, and carries out 'round tripping' to promote his personal affairs." The

petition alleges that Hogeg is depriving the petitioners, 17 shareholders in AOH, who are entitled to be registered

as owners of 35% of the shares in IDC, and has allegedly breached, and is breaching, in bad faith, his fiduciary

duty as a director and his duties of fairness and goodwill as a controlling shareholder, while committing theft,

fraud, and deceptive misrepresentation."

## C. Moshe Hogeg vs Anyoption: Court Appoints Temporary Liquidator.

36. In an article posted in November of 2018

https://www.financemagnates.com/cryptocurrency/news/moshe-hogeg-vs-anyoption-court-appoints-temporary-liquidator/, it states that; (emphasis added) "Investcom receives blow after failing to

attend court hearing; judge says that silence speaks volumes."

## D. Crypto Mogul Moshe Hogeg's ICO'S have unusual patterns, Analysis finds.

37. According to an article published on March of 2019

https://www.coindesk.com/crypto-mogul-moshe-hogegs-icos-blockchain, it states (emphasis

added) "In light of the questions that have been raised about Stox and Sirin Labs, CoinDesk partnered with the blockchain

analytics firm Alethio, part of the Brooklyn conglomerate ConsenSys, to use its new reporting tools to explore the ICOs in

which Hogeg has been involved. Alethio prepared a three-pronged report detailing its analysis, which covered the Stox ICO,

the Sirin Labs ICO and the LeadCoin ICO. The report concludes that all three ICOs have a single top holder in common, a

wallet that as of February 2019 still held roughly 3 percent of the supply of all three tokens, respectively. This wallet,

0x8c373ed467f3eabefd8633b52f4elb2df00c9fe8, also engaged in a unique pattern of transfers during the LeadCoin ICO,

which will be explored below. Although the blockchain analysis by Alethio doesn't show who controlled any wallets, and

Hogeg's spokesperson declined to clarify if they are aware of the owners, the blockchain analysis did show that the wallet

with all three tokens received LeadCoin tokens indirectly, through a repeating pattern of proxy transfers, from the

LeadCoin sale itself. Separately, Alethio also found that during Sirin Labs' SRN token sale, one wallet received 4,564 ETH

from the SRN sale's official wallet. This second wallet (0x59b681402bcb2c8460a506a88d75belcf1326528), later sent back

the same amount of ETH to the SRN sale's account, potentially creating the appearance of more activity.

Alethio data scientist Danning Sui explained that her team "found a circle of ETH transfers" related to the SRN ICO. Lastly,

this second wallet eventually received 50 percent of all SRN tokens, according to Alethio's analysis. Many of the SRN tokens

from this wallet appeared to end up on exchanges shortly after the sale. Both of these examined wallets have transaction

histories that are publicly recorded on the ethereum blockchain. Hogeg's spokesperson said they could not share

information about the wallet that recycled ETH funds in the Sirin Labs ICO and eventually received half of the token supply,

except to say: "This wallet participated in Sirin Labs' presale." When asked why this wallet received SRN tokens from the

sale, Hogeg's spokesperson replied: "We cannot share additional information."



*ETH*

*funds from the token sale were sent to wallet 0x59b681 and then sent ETH back into the sale's account. (Image courtesy of Alethio)* **What the blockchain says** Sui explained that the blockchain data does not suggest any connection between the parties that operated these wallets involved with withdrawals from the LeadCoin sale and Sirin Labs sale, respectively. Nor does the data suggest there is a pattern that connects these three sales other than common investors, such as the wallet 0x8c373ed467f3eabefd8633b52f4e1b2df00c9fe8, which is a top holder of tokens from Sirin Labs, LeadCoin and Stox. Regardless of who operated that top holder wallet during the LeadCoin token sale, Alethio's analysis showed patterns of it receiving LeadCoin tokens from 14 wallets. The source of those LeadCoin tokens, albeit with proxy transfers in between, can be traced back to the original sale contract, as illustrated below:



*(Image courtesy of Alethio)*

In short, tokens appear to have gone from the official LeadCoin issuance contract, through numerous independent wallets, to a single wallet that also happened to be one of the top-10 holders of SRN and STX, according to Alethio's analysis. Sirin Lab's spokesperson said this wallet from the LeadCoin sale has nothing to do with Singulariteam group nor Hogeg's secondary consulting firm Alignment Group, adding: "Chances are it belongs to one of the brokers in this industry. If it has

LeadCoin tokens it's probably because the owner has invested in LeadCoin." Alethio's new suite of <u>investigative tools</u> are not intended to guide interpretation of the data, Sui said. Instead, these tools are merely meant to help people make more informed decisions based on understanding the flow of funds. **Alignment Group** Aside from the above-mentioned lawsuit, it appears that some of Hogeg's relationships with other companies across the crypto ecosystem may now be strained. Since joining the blockchain sector in 2013, Hogeg has invested in and worked with many of Israel's crypto startups. Hogeg is the owner of both the VC fund Singulariteam and the blockchain consulting firm Alignment Group. A <u>press release</u> issued in 2017 indicated that Alignment was being founded as a "blockchain hub" by Hogeg's Singulariteam, the blockchain firm BlockchainIL and crypto investment group CoinTree Capital, run by Uriel Peled, also the founder of Orbs. The press release also noted that Alignment's clients included Bancor, and features a photo of Bancor co-founder Eyal Herzog. The Bancor company logo remains listed on the consulting firm's <u>portfolio page</u>. However, while Sirin Labs partnered with Bancor in the <u>SRN token sale</u> and Bancor published a <u>Facebook post</u> about SRN, a Bancor spokesperson told CoinDesk that "no Bancor founders have ever worked with Moshe Hogeg as an investor" and they did not have any "agreement with Alignment Group." The company logo for Orbs also appears on the Alignment website. An Orbs spokesperson told CoinDesk that although "several Orbs founders initially considered involvement in Alignment," none of them officially took part. Orbs founder and <u>former CoinTree CEO</u> Peled was also featured as a LeadCoin advisor on that <u>ICO's website</u> in 2017, a connection Orbs denied as well. Hogeg told CoinDesk that within a few short weeks after establishing Alignment, both of the other entrepreneurs – Peled and Herzog – left the advisory firm, leaving him as the sole owner. While an Orbs spokesperson denied involvement with any of Hogeg's crypto projects, CoinDesk was able to confirm with the Orbs team that Hogeg invested in Orbs through Singulariteam. Avishai Ziv, CEO of both Singulariteam and Alignment, told CoinDesk that his companies invested in both Bancor and Orbs. Ziv explained these investments sometimes took the form of services provided by Alignment, traditional fiat investments through Singulariteam or cryptocurrency sent by Hogeg, depending on the context. "Singulariteam, as a venture company, is not allowed to participate in any ICO," Ziv said of current legal

restrictions in Israel. "So, maybe sometimes Moshe is doing it on a personal level. Maybe sometimes other partners are also doing it on a personal level. Alignment mainly gets payments in light of service agreements before the ICO."

Singulariteam CFO Guy Elhanani is also simultaneously the CFO of Sirin Labs. As for the lawsuit, it claims that Hogeg urged investors to participate in the Stox ICO by claiming the token could be listed on the cryptocurrency exchange Binance. The consulting firm Hogeg owns called Alignment Group lists Binance on its portfolio page. However, a Binance spokesperson told CoinDesk: "We have no affiliation with Alignment Group. Our guess is that the firm has included the Binance logo on their website to indicate their personal portfolio of projects, ie. they may be holders of Binance Coin (BNB). We have no affiliation with STOX or Moshe." **Sirin Labs** Much like both the Stox and LeadCoin tokens, Sirin Labs' SRN token suffered in the broader market since ether prices dropped. According to ICO-class-action.org, there are now 52 people interested in filing a new lawsuit against Sirin Labs because that SRN asset and its blockchain ecosystem may not have sufficient value. As of the time of press, it is unclear who the plaintiffs would be or what the details of this alleged case would be, although a representative from the site confirmed that documentation for this prospective case is proceeding. Speaking of the broader market sentiment that might have influenced how people view his projects, Hogeg told CoinDesk: "We've seen a lot of value that was invested in the [blockchain] industry but there was not a lot of value created for real users." As for Sirin Labs, a Ukrainian retailer called Legio LLC confirmed it will soon start selling Sirin phones in Ukraine. A Sirin Labs spokesperson told CoinDesk more than 10,000 phones have been manufactured so far and the company plans to open a flagship store in Tokyo this April. Hogeg said such "real products" will take the blockchain technology "to mass markets," concluding: "What I see right now is a lot of bullshit is getting out of the industry and the real people who really understand the industry, the philosophy and the potential behind it, they are staying."

### E. The Stox.com ICO

38. Hogeg and his co-defendants' first ICO was the ICO of Stox.com. That ICO fleeced at least $32 million from people who were duped into buying Stox tokens that turned out to be essentially worthless.

39. To maximize the appearance of legitimacy created by associating the Stox.com ICO with the Invest.com name, Stox.com was characterized as a "spin off" of Invest.com and some of Invest.com's company directors (including Hogeg and Chen) were characterized as "advisors" to Stox. The purpose behind connecting Stox.com to Invest.com is unmistakable. Stox.com's CEO, Ophir Gertner, invoked the Invest.com name to set the Stox ICO apart from prior ICOs that resulted in buyers losing all or substantially all of their money: "The biggest difference, is that there is a real, substantial, experienced company [(Invest.com)] behind this…."

40. The "whitepaper" issued to promote the Stox.com ICO went even further: "Stox was designed by veterans of the online trading industry using the knowledge and experience acquired by invest.com. invest.com is an established online financial company which has been operating in the investment field since 2014. invest.com's trading platforms accommodate over 3 million registered users and facilitated more than 8 million transactions last year alone. invest.com currently employs over 200 employees across 5 countries, providing the solid foundation and infrastructure of the franchise to bootstrap the Stox network." That "whitepaper" bound Invest.com even more tightly to the Stox.com ICO by claiming that "invest.com will be one of the launch partners for the Stox network and serve among the first providers and operators. This will bootstrap activity in Stox from day one."

41. In addition to trying to create hype by tying invest.com name to the Stox token sale, they paid Floyd Mayweather Jr. to illegally promote the Stox token sale, and his actions were hugely responsible for convincing the Plaintiff to invest everything he had buying worthless STX tokens, as by doing so and pretending he was excited about the token sale, combined with Stox's announcing a special announcement was going to be made on the same day as Mayweather vs. McGregor. Unfortunately, this did not happen, everyone speculated that Stox was going to sponsor the fight, and Stox was aware this is what everyone thought, and they didn't deny it, nor try to calm the crowd down in their Telegram channel. It turns out the special announcement was that Stox had partnered with AnyOption, when in fact, this had happened months before the token sale.

42. Unlike a traditional Initial Public Offering ("IPO") of stocks or other registered securities that offer a fixed number of shares for sale and are regulated by the SEC or similar regulators in other countries, ICOs are almost completely unregulated and occur with no independent oversight. The damage that can be done by unregulated, unsupervised securities offerings was on full display with the Stox ICO.

43. To create an impression that Stox tokens purchased in the ICO would be valuable after the ICO, Defendants represented to potential purchasers of Stox tokens that the monies they paid to acquire Stox tokens in the ICO would be retained by Stox to "finance the Stox roadmap." In other words, the proceeds of the ICO would be retained by the company to support its operations and growth (much like money raised through an IPO generally gives value to the stock sold in the IPO because that money is retained by the company and put to uses that are intended to benefit the company and its stockholders). As it turned out, that claim was a lie.

44. In reality, less than $5 million of the $32 million collected through the ICO was actually retained by Stox.com. The rest was diverted elsewhere, including millions to Defendants.

## F. The Stox Whitepaper.

45. In or around the beginning of July 2017 Stox issued a White Paper setting out the terms of its proposed Platform. The Plaintiff downloaded and relied upon the White Paper, V03. It is noted that the current version of the White Paper, as made available on the Stox website, continues to be referred to as V03, but is materially different to the version made available the Plaintiff in July 2017. It seems that Stox sought to change the vesting schedule, at the last minute before the ICO, but failed to make the changes available and accessible by persons such as the Plaintiff who use android devices. This failure was accepted by Stox at the time and is beyond doubt.

46. In essence, the Platform comprises an online space for investors / users to trade on the outcome of all sorts of everyday events (sports, celebrity marriages, elections and so on). In order to trade on the Platform, users are required to purchase Stox Tokens 'STX'. The STX can then be used to purchase shares in the outcomes of various defined events, the price of such shares being dictated by the purchasing activity of other users (i.e. in effect, how likely other users consider the outcome of a particular event to be).

47. STX is an Etherum based token, and is used in all key operational aspects of the Platform, including transaction fees, syndicate payments as well as being

the functional currency for the predication events. The White Paper acknowledged the token as *"...an integral part of the Stox platform and the driver for its economy"* (p 10). It also stated that: *"Unlike other proposals for investment currencies, it is a flexible exchange-rate currency, making it exposed to liquidity and volatility risks"* (p 12). Certain 'risk factors' were identified by Stox, including liquidity difficulties (which were to mitigated by use of Bancor liquidity services *"...eliminating the need for pegging or stabilization mechanism"* (p 13)), and third-party risks (such as *competition, state or international regulation and digital currency market trends*).

48. As with most, if not all, cryptocurrency trading or investment platforms, a central part of the internal currency controls is the stated strategy for token issuance, including the vesting schedules. Plainly, the overall amount of currency issued, and over what period – particularly during the early phases of a newly launched service together with a linked currency – is critical both to the currency price and to its stability. The enhanced risk during the initial release phases was recognised in the White Paper, at p 10: *These risks are a big concern for most bootstrapping markets, when the proposed service launches together with the currency, and in the subsequent period of no or little growth of the service.*

49. The Stox token issuance strategy was set out on p 43 of the White Paper (the version as relied upon by the Plaintiff). Stox indicated that, as is common in this area, it would be holding an initial coin offering ('ICO'), at which an initial supply of STX would be made available to the market, purchasable in Ether (an established open-source cryptocurrency generated by the Etherum platform).

Stox imposed a hard cap on the initial token offering of 148,000 ETH. STX was offered at a fixed exchange rate / price of 200 STX per ETH. It was stated that, at close of the ICO, *"...the distributed STX will constitute the entirety of the available liquid supply"* (White Paper, p 43). Thereafter, the release of STX was to governed by the distribution table / vesting schedule, which provided as follows:

| % of Total Supply | Beneficiary | Special terms |
|---|---|---|
| 50% | Token sale participants | Coins cannot be transferred until end of token sale period |
| 12.5% | Invest.com Ltd | Uniform 12-month vesting schedule |
| 10% | Stox team | Uniform 24-month vesting schedule |
| 27.5% | Stox Ltd. | Uniform 12-month vesting schedule. Will be used to bring strategic partners to the Stox ecosystem, and as operational reserve. |

50. Thus, the advertised strategy was that there would be an initial capped offering of STX, which would be sold at a constant price in ETH. The ICO sale period was to last for a maximum of 14 days (White Paper, p 44). As can be seen from the first row of the distribution table (above), the figure representing the number of STX sold during the ICO would be used to set the limit of the overall

supply of STX; i.e. the initial number of STX sold was to be 50% of the overall coin supply. If for example 10,000 STX were sold during the ICO, the overall coin supply would be 20,000. The purpose of this was to keep coin stock vis-à-vis coin supply in proportion and therefore (in line with the token issuance strategy more generally) limit the risks of illiquidity and of exchange rate volatility.

51. For predominantly the same reasons, controls were imposed on the further release and distribution of STX. Following the ICO, 12.5% of the total STX supply was to be transferred to Invest.com (in light of its on-going role in the operation of the Platform); but those STX could not be sold or released onto the Platform for 12 months. A further 10% was transferred to the Stox team, not to be sold or released for 24 months; with 27.5% to be retained by Stox itself, but which were not to be used for 12 months.

52. The token issuance strategy, including the vesting schedule, is fundamental to a prospective user's assessment of the likely stability of the currency used on the platform in which he or she is considering to invest (in this case, STX).

53. In addition to being a key indicator as to the likely stability and market price of the currency, the advertised token issuance policy is central to a prospective user's assessment of the likely commitment of the organisers and operators, to the operation of their platform. In the case of Stox, the company was to retain 27.5% of the total supply of STX which, in accordance with the distribution table, it was prevented from selling or transferring for at least the first 12 months. One of the purposes of these vesting arrangements is to commercially

incentivise the token holder (usually the operator or its staff) to make the platform work. Users know, when they decide to invest, that the operator (in this case Stox and the Defendants), cannot sell its tokens until the end of the most important initial phase of the project. It is incentivised to make the platform as good as it can be, and to maintain and /or improve the currency price, such that, at the end of the vesting period, it can sell its retained tokens for the best price. The initial months of a trading platform such as this are critical.

54. The converse is plainly the case, in circumstances where the operators is entitled to sell its tokens immediately after the ICO. The price payable for the STX in this case was fixed during the ICO. Thus, subject to fluctuations in ETH, the value of each STX was clear. Thereafter, once opened up for trade on the general online currency exchange market, the price would fluctuate. In the absence of controls requiring Stox (and other STX holders – invest.com and Defendants herein) from vesting their STX, they could simply dump all their tokens on the market, likely achieving a reasonably high price not too dissimilar to the fixed ICO price. The token holder would have no incentive to keep his tokens or to work on maintaining or increasing the token value over the vesting period. Furthermore, the market would be flooded causing instability and inevitable depression in the value of the currency. In the event, as further explained below, this is exactly what happened in this case.

### G. The ICO and the Plaintiffs investment

55. The ICO took place in July 2017. The hard cap was met, with the result that Stox sold 29,600,000 STX at a fixed price of 200 STX per ETH. This produced an income for Stox of around $32m (as, at that time, the price of ETH was a little over $200 per ETH). The Plaintiff did not take part in the ICO (as a US citizen he was in fact not entitled to do so). At the end of the ICO (and in accordance with the distribution table, above) users were entitled to transfer (sell / exchange) STX purchased during the ICO. On the basis of the representations and statements made by Stox in the White Paper, The plaintiff chose to invest in the Platform through the purchase of STX.

56. Prior to investing in the Platform, the Plaintiff maintained a significant balance of Cryptocurrencies. Following the ICO, the Plaintiff traded a large amount of his Cryptocurrency balance in exchange for STX. The transactions were all carried out through 'Liqui', an online cryptocurrency exchange platform (www.liqui.io).

57. Prior to investing, the Plaintiff considered the statements made about token issuance and in particular the proposed staged release of STX over the advertised vesting periods. He was satisfied that the stated strategy would likely provide a sufficiently stable currency as well as commercially incentivising Stox to use best endeavours to make the Platform as good as it could be. The combination of a stable currency, controlled during the initial phases in particular, and combined with a committed and incentivised operator, is essential if a new

product is to work (particularly when launched at the same time as a new currency).

58. Along with many other investors, the Plaintiff relied on the truth of the matters stated by Stox in its White Paper, and in particular the stated token issuance strategy. Whatever weight might be placed on other more aspirational aspects of white papers, Stox would well have known the importance placed by prospective users on the commitments made in the White Paper in respect of the token issuance and release strategy. This is fundamental. In this particular case, the exposure of users to the risk of currency fluctuation (as acknowledged in the White Paper), enhanced the importance of the structural and procedural currency controls / safeguards promised in the White Paper. More generally, vesting schedules, together with assessment of market caps and other data, are routinely used in the industry to assess and predict future rates and market volatility in cryptocurrencies.

## H. Stox's conduct and consequential currency collapse

59. Shortly after the Plaintiffs investment, it became apparent that the STX currency was  performing very badly. The price at which STX was trading had drastically reduced. It soon transpired that, contrary to the White Paper commitments, Defendants had transferred and /or sold a significant number of its 27.5% reserve of STX. It appears that these individuals in turn sold their STX

in large quantities and as quickly as possible (so as to transfer them for everyday currencies).

60. At today's date, there are 43,004,816 STX in circulation - around 16m more than there ought to be according to the White Paper. Most if not all of these were effectively dumped on the market in the immediate weeks following the close of the ICO. The STX market become flooded and the currency began to plummet in value. The predicators Platform had quickly become commercially unviable for investors. News of the behaviour of Stox spread rapidly online amongst Stox investors as well as others in the industry.

61. On telegram heated discussions rose up about the vested tokens, and questions were also raised about the Stox ETH Wallet.

62. The person who first brought it to everyones attention was soon after banned from the telegram channel based on antisemantics. Although he was banned, questions about vested tokens continued.

63. In an official announcement posted on their medium channel on September 27th 2017 Stox claimed that; (emphasis added) "Yesterday there were a lot of comments in the Stox Telegram group about transactions in the Stox wallet. Last night members of the Stox team communicated with those who had been most vocal on the matter. This is an explanation of the activity in the wallet which had raised questions.· Prior to the Stox token sale, contributions were made through the pre-sale. Some of these contributions were made in fiat.· We converted the contributions into Ethereum and moved them into a wallet. The sum which appeared in this wallet was 888 ETH.· After the token sale this wallet was used by the primary shareholder to buy more STX in the market. The ETH from the wallet was purchased from the company by Moshe Hogeg. These were used to purchase additional STX. Although this may not have been the best way to manage the wallet, it was done in

good faith. Additional Stox tokens were purchased by Moshe as he is a huge fan of Stox who strongly believes in what we are doing as he has said many times. There has been no unethical behavior, nor any dumping of Stox token. We apologize for the confusion we caused and will take better care in future"

64. Later on September 28th 2017 Stox made another official announcement. In regards to the tokens which were supposed to be vested they stated; (emphasis added) "Where we could, and in retrospect, should have been clearer, is how pre-sale costs, for example, marketing, bonuses, bounties, Wings, advisors, vendors, etc., dilute the Allocation Pools. The aforementioned pre-sale costs accumulated to a total amount of tokens equal to: 20.7%. Ideally, we should have included the table below with the fully-diluted Allocations, after the pre-sale costs were applied.

| % of Total Supply | Beneficiary | Special terms |
|---|---|---|
| 7.32% | invest.com Ltd. | Uniform 12-month vesting schedule |
| 5.86% | Stox team | Uniform 24-month vesting schedule |
| 16.11% | Stox Ltd. | Will be used to bring strategic partners to the Stox ecosystem, and as operational reserve |

III. Takeaway: It is important for us to acknowledge that we should have ensured such information was articulated clearly in advance of the sale. We not only apologize, but also promise to be more mindful in the future in how we communicate such vital information. The community uproared, about the changes from invest.coms allocated 12.5% and Stox team 10% and demanded they vest the tokens according to the whitepaper. Then on October 2, 2017 Stox made another official announcement wherein they stated "We have made some changes to Stox wallet

allocation. We decided that the Stox wallets should reflect what is published in the whitepaper, rather than how they appear in our last update, and have therefore done the following: (a) The pre-sale costs which diluted all allocation costs have been reimbursed to the vested wallets. All costs have been charged to the company's non-vested wallet. (b) The tokens in the vested wallets now accurately represent how they were presented in the whitepaper and constitute a total of 22.5% of tokens. (c)You can see the actions we took in the trustee wallet: "0x7970713D8D7a2815CCF3dcF9719e3e9F1712c370  (d)We hope and believe this reflects our commitment to being fair and transparent."

* It is important to note that the actions they took in the trustee wallet still did not reflect the vesting schedules laid out in the version of the Whitepaper that the Plaintiff and anyone else who used android devices relied on.

### I. Stox lists it tokens on Bancor exchange.

65. In early October of 2017 Stox finally listed the STX token on the Bancor Platform. But by then the price had dropped from a high of $2.70 to about 48 Cents

66. According to the Whitepaper they were supposed to use a reserve of 4% of the marketcap. However when they activated on bancor they only used a reserve of 4% of the marketcap at the time of activation. This did two things.

1) saved stox over a million usd from purchasing bnt for a reserve

2) by activating the smart token at such a low price made it much harder to reach ico levels as the liquidity that would be provided by Bancor depended on the amount of BNT tokens placed in the reserves, and would guarantee that millions of dollars had to be injected into the smart token reserves just to bring it back to the price during the ico.

67. The Plaintiff, realising what had happened, reasoned that maintaining his investment in STX and engaging in the trading platform would cause nothing but

very significant further losses. The reputation of Stox and the Platform was, for good reason, in tatters. In order to mitigate his losses, the Plaintiff began to extract his STX, though a series of transactions as Stox was forced to add more liquidity on the Bancor Platform. But notwithstanding this action the Plaintiff sustained significant losses. Although the figures are still to be finalised, based on the difference between the price at which the STX was purchased and that at which it was sold, the Plaintiffs loss is around $431,772.

## J. Material Misrepresentation and / or, negligent misstatement in the Whitepaper.

68. It is the Plaintiffs claim that, but for the statements and /or representations made in the White Paper, upon which he reasonably relied, he would simply never have purchased the STX. It is the Plaintiffs contention that the Defendants are liable for these losses due to material misrepresentation and /or, at the very least, negligent misstatement in the White Paper.

69. The distribution table on p 43 of the White Paper was amended the day before the ICO, in particular by removing the requirement for Stox to vest its 27.5% of the token supply for 12 months. First, Stox failed to upload the amended version in a format that could be accessed by all prospective investors (including the Plaintiff); and secondly, changing the parameters of the token issuance strategy and vesting schedule the very day before the trading goes live is demonstrably bad practice and very likely to lead to misguided or misinformed investments decisions to be made by prospective users. The Defendants made

very little effort to bring this fundamental change to the vesting programme to the attention of investors. Certainly, the Plaintiff and many others knew nothing about it. At best the behaviour of the Defendants was negligent.

70. It is hardly surprising, then, that Stox tokens have dropped by more than 99% since the ICO and are now effectively worthless.

## K. The Stox ICO Violated Numerous Laws, Including United States Securities Laws

71. Even though Hogeg and his co-conspirators issued to themselves with the intent to sell and did sell Stox tokens to purchasers in the United States through the cryptocurrency exchange "liquid" and/or, the cryptocurrency exchange "etherdelta", they did not register the Stox ICO or tokens with the SEC, never provided any prospectus to prospective purchasers of Stox tokens.

72. Defendants' intent to unload Stox tokens on people in the United States is clear. First, they used United State celebrities to promote the Stox ICO in the United States. They paid boxer Floyd Mayweather $100,000 to promote the Stox ICO by proclaiming to his approximately 21 million Instagram followers that he was going to make "a $hit t$n of money … on the Stox ICO". Mayweather is a well-known professional boxer whose celebrity is primarily limited to the United States and whose Instagram followers are primarily based in the United States.

73. Hogeg was suddenly able to pay $7.2 million to buy one of Israel's top soccer teams, $19 million to buy land in a Tel Aviv suburb in one of the most expensive real

estate transactions in Israel's history, and $2 million to promote his public image through a donation to Tel Aviv University.

74. On information and belief, the funds Hogeg used for those purchases and that donation were funds which he embezzled from the many I.C.O.'s he has ran, including the Stox I.C.O.

75. As a result of this misconduct and these breaches of contract by Hogeg and the other Defendants, Plaintiff has been damaged in an amount to be proved at trial, but which is estimated to be not less than $430,000

76. Waiting almost two years since originally contacting the Attorneys representing Stox Technologies LTD for them to come back with a reasonable settlement offer to no avail has caused immense stress for the Plaintiff. In fact, the stress was so bad, that even though the Plaintiff was Married only weeks before he learned of Stox, he was subsequently legally separated from his wife after only having been married for less than 7 months.

77. In addition to that, he had taken all the equity out of his home to invest into Cryptocurrencies, and now has absolutely nothing to show for it, and no longer owns a home of his own.

## L. A LAWSUIT AGAINST STOX BROUGHT IN TEL AVIV

78. In January of 2019 I read an article posted online by calcalistech.com wherein it stated that; (emphasis added) " Chinese citizen Zhewen Hu ("Hu") filed a lawsuit Against Moshe Hogeg and Stox Technologies LTD alleging that Hogeg gave money gotten from the buyers of crypto-coin called Stox to himself and other companies he was involved with. The plaintiff alleges that Stox, which is registered in Gibraltar, is fully owned by Hogeg and operated from his office in the greater Tel Aviv metropolitan area, and was claiming

damages of $4.6 Million Dollars. Hu alleged that Hogeg "emptied the company of all of the proceeds of the ICO," either pocketing the funds or using them to float other businesses linked to him. According to the lawsuit, Hu purchased Stox tokens with $1.8 million worth of Ethereum on the day of the ICO. He later purchased additional tokens valued at $2.8 million. The plaintiff said he was encouraged to invest more funds into Stox by a series of messages from Hogeg himself. According to the lawsuit, Stox boasted to investors about its strategic partnership with Invest.com without disclosing that it, also, was owned and operated by Hogeg. "Hogeg signed agreements with himself," the lawsuit reads. In the agreement, Hogeg committed, as the owner of Stox, to pay himself, as the owner of Invest.com, 12.5% of the Stox tokens minted in the ICO as well as additional $2-3 million from the earnings of that ICO. The suit also included a testimony by Ran Ashtar, Stox chief financial officer— who is not named in the lawsuit— who said in a private questioning earlier this month Hogeg managed to somehow "transfer money from one pocket to another." Of the $34 million raised in the ICO, only $5 million were received by him as the budget for the company, Ashtar said. The suit further alleges that the company loaned money and distributed unauthorized dividends to Hogeg and other people connected with him, in compliance with instructions given by Hogeg himself. This included money that was transferred as part of the ICO of Israeli blockchain company URBS. Money also flowed from Stox to Hogeg's other companies, Sirin Labs and Singulariteam, the suit alleged. As a result, the suit said, Stox ceased operations, letting go all its employees in October 2018. Hogeg reacted to the dissolution of the company on Twitter, blaming regulation in Israel for its untimely shutdown. Relevant regulation in Israel has not changed since the day of Stox's ICO to the time it let go its employees, the lawsuit notes. According to the suit, the Stox app was ultimately launched with no promotion and was downloaded by some 1,000 android users. Invest.com is not active but for a landing webpage, the lawsuit alleges."

79.  Eventually the lawsuit was forced into mediation wherein I have read that it was determined that the Jurisdiction for the lawsuit was not the correct jurisdiction, as part of the settlement Hogeg agreed to pay Hu $50,000 to cover his attorney fees."

## FIRST CAUSE OF ACTION

### (Breach of Investment Contract)

### (Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). A valid and enforceable contract, the terms of which are alleged above, existed between, on the one hand, Plaintiff and, on the other hand, Stox.

(3). Failed to perform their obligations under the WhitePaper.

(4) The defendants breaches of the agreements in the Whitepaper and subsequent divesting of Tokens which were supposed to be vested herein caused Plaintiff to suffer damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duties)

### (Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). FIDUCIARY DUTY:  As Trustees of the tokens which were supposed to be Vested, the defendants owed a fiduciary duty to the Plaintiff to actually Vest those tokens according to the conditions set out in the Whitepaper.

(3). BREACH: Defendants breached their fiduciary duties to vest the tokens for the time specified in the Whitepaper

(4). DAMAGES: Plaintiff has been damaged by the breach of the defendants Fiduciary Duties.

(5). CAUSATION: Those statements transpired to be false and/or were not in the event adhered to by Defendants with the result that the market was improperly flooded with Tokens, causing a drastic and unpredictable loss in value of the currency.

(6). Defendants' conduct in breach and in aiding and abetting the breach of the fiduciary duties owed to Plaintiff was done with malice, oppression or fraud and with the intent to cause damage to Plaintiff, entitling Plaintiff to an award of exemplary damages.

## THIRD CAUSE OF ACTION

### (Fraud)

### (Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2) That a material representation was made;

(3) The representation was false;

(4) When the representation was made, the defendants knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

(5) The defendants made the representation with the intent that the other party should act upon it;

(6) The Plaintiff acted in reliance on the terms and representation; and

(7) The Plaintiff thereby suffered injury.

## FOURTH CAUSE OF ACTION

(Intentional infliction of emotional distress)

(Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2) The tort of intentional infliction of emotional distress has four elements:

(3). The actions of all defendants meet the elements needed to bring this Fourth cause of action because;

(a) the defendant must act intentionally or recklessly;

(b) the defendant's conduct must be extreme and outrageous; and

(c) the conduct must be the cause

(d) of severe emotional distress;

(4) The damages sustained from the Intentional infliction of emotional distress include;

(a). Loss of Consortium

(b). Loss of Enjoyment of Life.

(c). Lost Earning Capacity

(d). Mental Anguish

## FIFTH CAUSE OF ACTION

(Unjust Enrichment)

(Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2) The Plaintiff purchased STX tokens.

(3) The Defendants were Unjustly Enriched.

## SIXTH CAUSE OF ACTION

### (Declatory Relief)

### (Against Stox Technologies LTD)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2) A justifiable controversy exists between two or more parties;

(3) Regarding their respective rights pursuant to a contract;

(4) Such that the plaintiff asserts a claim of a legally protected right;

(5) The issue is ripe for judicial determination; and

(6) Plaintiff asks the court to determine the parties' relative rights under the contract.

## SEVENTH CAUSE OF ACTION

### (Accounting)

### (Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). Plaintiff is entitled to a full and complete accounting of;

(a). Details and evidence of all STX tokens held by Stox, or to its order, Invest.com Ltd, Stox Team and Stox Ltd as at the moment and date of the close of the ICO, together with

details and evidence of how many of those tokens it sold, transferred, assigned or otherwise divested itself of, over the period from the close of the ICO to-date.

(b). Details and evidence showing when and to whom those tokens were sold, transferred, assigned or otherwise divested of.

(c). Details and evidence of any Fiat monies that were contributed to the ICO, by whom, and to whom, which was purportedly used to purchase ETH from the pre-ICO contract and which were subsequently used again to purchase more STX tokens during the main sale.

(d). An accounting as to what was done with the 32 Million worth of ETH that was raised in the ICO.

(3). The Plaintiff is entitled to know when and for what reason Stox appears to have divested itself of millions of tokens, which it promised to vest for up to 24 months. He is entitled to know what happened to those coins. Apart from anything else this information will be required in order instruct an expert to opine on the effects of the currency release on the price and volatility of the STX market. Further, their advance disclose is "desirable" for one or other of the following reasons; to-

(i) dispose fairly of the anticipated proceedings;

(ii) assist the dispute to be resolved without proceedings; or

(iii) save cost.

(4). Clarity on the issue as to exactly what happened with the STX held by Stox or to its order, Invest.com, Stox Team and Stox Ltd, and all defendants and when, is central to the Plaintiffs claim. It is also central to the questions of loss and causation.


**EIGTH CAUSE OF ACTION**

(RICO – 18 USC §§1961, et seq.)

(Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). As alleged herein, Stox Technologies LTD and Moshe Hogeg acquired and/or maintained, directly or indirectly, an interest in or control of an enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961 and 1962.

(3). During the ten (10) calendar years preceding November 22, 2019, each of the defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate violations of law itemized at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. 1962(a),(b),and(c).

(4). Among the predicate violations of law committed by the defendants are: (1) wire fraud, in violation of 18 U.S.C. §1343, (2) violations of the Securities Act of 1933, 15 U.S.C. §77a, et seq., and (3) violations of the Securities Exchange Act of 1934, 15 U.S.C. §78a, et seq. In pursuit of their fraudulent and illegal activities alleged herein, Defendants caused writings, signs, signals and sounds to be transmitted by means of wire, radio or television communication in interstate and/or foreign commerce, for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

(5). Plaintiff is accordingly entitled to an award of threefold the damages he proves at trial, the costs of suit and reasonable attorneys' fees.

## FIRST CLAIM FOR RELIEF

### (Against All Defendants)

Unregistered Offer and Sale of Securities Violations of Sections 5(a) and 5(c) of the Securities Act (against Stox Technologies LTD, and Moshe Hogeg )

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). As alleged above, Defendants Stox and all others offered and sold securities, in the form of Stox's "STX" tokens, to investors in interstate commerce, without filing a registration statement with the SEC, and without qualifying for any exemption from registration.

(3). By engaging in the conduct described above, Defendants STOX and all others, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

(4). By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).


## SECOND CLAIM FOR RELIEF

Unregistered Broker-Dealer Violation of Section 15(a) of the Exchange Act

(Against All Defendants)

(1). Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

(2). By engaging in the conduct described above, Defendants Stox and all others, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

(3). By engaging in the conduct described above, Defendants Stox and all others have violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).


PRAYER Wherefore, Plaintiff prays for judgment against defendants as follows:

I.

41

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. And also;

1. For general and special damages;

2. For treble damages;

3. For exemplary damages;

4. For compensatory damages;

5. For costs of suit herein, including reasonable attorneys' fees; and

6. For such further relief as the Court may deem just and proper.

## I.        CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 11-25-19

Signature of Plaintiff _____

Printed Name of Plaintiff   SEAN SNYDER_____